JAMES T. HILL AND PATRICIA A. HILL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hill v. Commissioner
Docket No. 26579-85.
United States Tax Court
T.C. Memo 1987-380; 1987 Tax Ct. Memo LEXIS 555; 54 T.C.M. (CCH) 6; T.C.M. (RIA) 87380; August 3, 1987. Dean Kalivas, for the petitioners. Henry Thomas Schafer, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax under sections 6653(a)(1) [1] and 6659: Addition to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6659
1978
$  8,039
$ 402
$ 2,412
1979
$  7,890
$ 395
$ 2,367
1980
$ 10,279
$ 514
$ 3,084
1981
$ 14,315
$ 716
$ 4,295
In addition, respondent determined that petitioners are liable for an addition to tax for 1981 under section 6653(a)(2) and asserted in his answer that petitioners are liable for additions to tax under section 6621(d). [2]
*557 The deficiencies are attributable to the disallowance of an investment tax credit in the amount of $ 37,500 claimed on petitioners' joint income tax return for 1981 and used, in part, as an investment tax credit against petitioners' tax for that year and, in part, as an investment tax credit carryback to 1978, 1979, and 1980, together with the disallowance of certain expenses deducted in respect of the leasing of two master recordings. In their brief, petitioners concede that the investment credit and deductions attributable to the master recordings are not allowable and that the only issues to be resolved are whether petitioners are liable for the determined additions to tax under sections 6653(a)(1) and (a)(2), 6659, and 6621(d). FINDINGS OF FACT At the time the petition was filed, petitioners, husband and wife, were residents of Tacoma, Washington. They filed joint Federal income tax returns for 1978, 1979, 1980, and 1981. In 1981 and for several years previously, petitioner James T. Hill was employed full time as a school principle and Patricia A. Hill was employed as a schoolteacher. In April 1986, Mr. Hill retired and Mrs. Hill continued to teach. Neither one of them *558 had any experience in or knowledge of the music business or recording industry. On or about December 22, 1981, petitioners purportedly leased a one-half interest, as tenants in common with other individuals, [3] in two master recordings of music from Audio Leasing Corporation (Audio) and executed the following documents: 1. Two Joint Venture -- 50% Equipment Leases dated December 23, 1981, [4] purportedly covering G-443, a master recording by Webb Pierce, and G-448, a master recording by Stonewall Jackson. 2. A distribution agreement dated May 15, 1982, between petitioners and Accord Record Corporation (Accord) with respect to the Webb Pierce recording. 3. A distribution agreement dated May 15, 1982, between petitioners and Accord with respect to the Stonewall Jackson recording. 4. Two promissory notes *559 dated December 23, 1981, and due August 1, 1982: one for $ 11,000 for G-443 and the other for $ 7,000 for G-448. Petitioners received from Audio statements, dated December 24, 1981, that an election had been made to treat petitioners, lessees, as having purchased the recordings for investment tax credit purposes and setting the fair market value of the Webb Pierce recording at $ 200,000 and the Stonewall Jackson recording at $ 187,500. In connection with the two leases, petitioners made the following cash payments in 1981:
$ 1,000 for G-443 to Audio
1,000 for G-448 to Audio $ 250 to R. L. Brodrick for an appraisal
$ 2,250 Total
In 1982, petitioners made the following additional payments with respect to the recording leases: Date
Payee
Amount
2/ 7/82
Hendricks
$     25.00
3/ 5/82
R. L. Brodrick
400.00
7/29/82
Audio
19,564.00
7/29/82
Accord
5,000.00
Total
$ 24,989.00
Petitioners' total payments in connection with the leases thus came to $ 27,239.03. The leases provide that the lessor will receive 50 percent of the net revenues from the recordings; no revenues were ever produced. On Schedule C of their income tax return *560 for 1981, petitioners reported no income but claimed the following deductions with respect to the master recordings: Legal and professional
$    275
Lease payments
16,000
Total deductions
$ 16,275
On a Form 3468, Computation of Investment Credit, petitioners claimed an investment tax credit of $ 37,500 for the master recordings, using an adjusted basis of $ 375,000 for them. [5] For 1981, petitioners used only $ 7,320 of this credit to extinguish their tax liability. They filed carryback applications for tentative refunds and received refunds of taxes paid in prior years as follows: 1978
$  8,061
1979
9,345
1980
10,034
Total
$ 27,440
Petitioners carried the remainder, $ 2,470, of the claimed 1981 investment tax credit forward to 1982. On their 1982 income tax return, petitioners claimed the following Schedule *561 C expenses with respect to the master recordings: Interest
$  1,964
Lease payments
4,000
Distribution fee
5,000
Total
$ 10,964
On their 1983 return, petitioners did not include a Schedule C for master recordings and did not report any receipts, income, or expenses for the master recordings venture. Audio did not, in fact, own the master recordings which it leased to petitioners. On January 26, 1979, Webb Pierce had entered into an agreement with Skylite-Sing, Inc., (Skylite) to record two long-play albums containing 10 songs each, including the songs covered by the so-called master recording leased to petitioners. The recording was done and the album was released. The sales was not outstanding (about 2,000 copies). Skylite licensed the album to Paul Wyatt on a nonexclusive basis for $ 2,500. In addition, Skylite licensed two of the songs to Richard Heard on a nonexclusive basis. There is no evidence to show that Skylite or Webb Pierce transferred any right, title or interest in the songs to Audio or petitioners. In the late 1970's, Stonewall Jackson recorded some of his early hits as well as some new materials for GRT Records (GRT). In 1979, *562 Nelson Larkin (Larkin) purchased the entire GRT record catalog for $ 100,000. In this acquisition, Larkin acquired the masters for all of the Stonewall Jackson recordings made for GRT as well as his recordings for MGM, including the songs covered by the recordings purportedly leased by Audio to petitioners. Since his 1979 acquisition, Larkin has retained possession and ownership of these Stonewall Jackson recordings. Larkin licensed three of the Stonewall Jackson performances to Warner Brothers Records on a nonexclusive basis. There is no evidence in the record that Larkin or Stonewall Jackson transferred to Audio or petitioners any right, title, or interest in the songs purportedly leased to petitioners. If the two master recordings leased by petitioners had carried exclusive rights, they would each have had a value of about $ 10,000. If they were nonexclusive, they would each have been worth "in the marketplace among people who deal in this kind of product, around $ 3,000." Because petitioners purportedly acquired only a one-half interest in the recordings, petitioners' interests, assuming they acquired such rights, would have had a fair market value of not more than one-half *563 of those amounts. In fact, because the recordings were pirated and neither petitioners nor Audio had any rights herein, they were without value. The master recording proposal was presented to petitioners by a tax shelter promoter, Dwayne Rose (Rose), a close friend of Mr. Hill. In making the sale, Rose discussed the tax aspect of the venture, referred to a case in the Court of Appeals for the Ninth Circuit, and showed petitioners a number of brochures. Petitioners were acquainted with Robert Sparling, the other co-owner of the Webb Pierce recording, but did not know who the other co-owner (later Howard Motteler) of the Stonewall Jackson recording was. In entering the master recording transaction and claiming the deductions related thereto, petitioners put their "faith in the salesman." They did not have the cash required for the purported investment and could have financed the deal only by obtaining the refund of the taxes they had paid for the years to which the investment tax credits were carried. They did not audition the master recordings before entering the transaction and, in fact, did not receive them until 1983. They knew nothing about the mechanics or prospects of *564 the recording industry and did not even know how many recordings would have to be sold to recover their investment. They made no investigation of the title to the recordings, the artists' contracts with others, or any copyright to the recordings. Petitioners had no special knowledge of the tax laws on investment tax credits. As part of the master recordings transaction, the services of an accountant, who had never previously prepared petitioners' tax returns, were provided for the preparation of their returns for 1981 on which they claimed the investment tax credit which was applied to 1981 and earlier years; the same accountant prepared their 1982 return on which they claimed the investment tax credit carryover. Petitioners' return for 1983 was prepared by the accountant who had previously prepared their returns. In determining the deficiencies in dispute, respondent disallowed the investment tax credits claimed for 1978, 1979, 1980, and 1981 and the deductions claimed on Schedule C of petitioners' joint return for 1981 and determined that petitioners are liable for additions to tax under sections 6653(a)(1) and (2) and 6659. In his answer, respondent asserted that petitioners *565 are also liable for the addition to tax imposed by section 6621(d). OPINION Petitioners have conceded that they are not entitled to the investment tax credits and business deductions claimed on Schedule C of their 1981 return with respect to their master recording lease transaction. We are left only with a dispute as to petitioners' liability for the additions to tax. The burden of proof rests with petitioners on the sections 6653(a)(1) and (2) and 6659 additions, , and on respondent with respect to the section 6621(c) addition. 1. Section 6653(a)(1) and (2)
Section 6653(a)(1) [6] provides for the imposition of a 5-percent addition to tax if any part of the underpayment of tax is due to negligence or intentional disregard of the revenue laws. Section 6653(a)(2), [7] effective for 1981, imposes a further addition to tax in the form of 50 percent of the interest payable on the portion of the underpayment attributable to negligence. *566 For 1981, petitioners invested cash of $ 2,250 and gave their promissory notes of $ 18,000 as consideration for the master recording leases. On their 1981 tax return, they claimed deductions of $ 16,275 and an investment tax credit of $ 7,320, thereby extinguishing the liability for that year. In addition, they claimed and obtained tax refunds for 1978, 1979, and 1980 totaling $ 27,440. For 1982, petitioners invested another $ 24,989.03 (mainly to pay the promissory notes and interest) and claimed deductions of $ 10,964 and an investment tax credit of $ 2,740 carried forward from 1981. Thus, for their total investment of $ 27,239.03, they claimed investment tax credits of $ 37,500 and total deductions of $ 27,239. Petitioners are intelligent, well-educated individuals. Mr. Hill was a school principal and Mrs. Hill a schoolteacher for years before entering the master recording venture. Although they knew nothing about the music industry, we think petitioners knew that the grossly excessive tax benefits claimed on their returns for signing the lease agreements and related papers were too good to be true. If they were not so informed, they were negligent in failing to seek advice *567 on the allowability of those spectacular tax benefits. To prepare their 1981 and 1982 returns, petitioners did not employ the accountant who had prepared their returns for several previous years but used an accountant provided by the master recording promoters. Even that accountant, in a letter dated April 14, 1982, cautioned petitioners that he could not, and would not, "assure a client that the equipment leased from Audio Leasing would withstand a challenge by the Internal Revenue Service based on Fair Market Value assigned or whether or not they had acquired a tangible asset." Mr. Hill admitted that he knew nothing about investment tax credits. Yet, petitioners filed the return claiming the investment tax credits totaling $ 37,500 even though they expended only $ 2,250 in 1981. Based on those credits they claimed and received the refunds for all taxes they had previously paid for 1978, 1979, and 1980 along with an investment tax credit sufficient to extinguish their 1981 liability without consulting any knowledgeable tax consultant. In Mr. Hill's words, he put his "faith in the salesman"; to do so, in our opinion, was negligent. In addition, on petitioners' 1981 income tax *568 return, they claimed a deduction of $ 16,000 for "Lease Payments" and $ 275 for an appraisal. Petitioners made lease payments of only $ 2,000 in 1981. The accountant who prepared petitioners' income tax return for 1981, in the letter dated April 14, 1982, was careful to state that the return was "based on information provided by you" and that he relied on his "clients to report income and deductions accurately and disclose all material facts to me." The record contains no explanation of why petitioners claimed the lease payments of $ 16,000 when they expended a maximum of $ 2,000 for that purpose. Petitioners have not shown that the mistake was not due to their negligence or intentional disregard of the revenue laws. Petitioners have not carried their burden of proving that the section 6653(a)(1) and (2) additions to tax are not applicable. 2. Section 6659 Addition to Tax
Section 6659 provides that if an individual has an underpayment of income tax which is attributable to a valuation overstatement, there shall be added to the tax an amount equal to a specified percentage of the underpayment attributable to the overstatement. For an overvaluation of more than 250 percent, *569 the applicable percentage is 30. There is a valuation overstatement if the value of the property claimed on any return exceeds 150 percent of the amount determined to be the correct amount of such valuation. [8]
*570 In this case, petitioners claimed the investment tax credit of $ 37,500 based on a fair market value of $ 375,000. We have found as a fact that petitioners' lessor did not own the master recordings purportedly leased to petitioners and that whatever petitioners acquired was without value. Even if the lessor had had good title, the master recordings each had a fair market value of not more than $ 10,000 if they carried exclusive rights and not more than $ 3,000 if they carried nonexclusive rights. The $ 375,000 value used by petitioners' investment credit claim was based on a valuation overstatement of more than 250 percent. Accordingly, the 30-percent section 6659 addition to tax is sustained with respect to the disallowed investment tax credit. We see no ground for holding that the Commissioner abused his discretion in refusing to waive all or any part of the addition to tax pursuant to section 6659(e). [9]
*571 Part of the underpayment for 1981, as discussed above, was due to the $ 16,275 claimed as deductions for lease payments and related expenses. We are aware, as respondent argues, that Audio had a catalog of master recordings for lease and that the lease payments were generally geared to the values of the various recordings listed in the catalog. We do not think, however, that there is any direct relationship between the disallowed $ 16,275 deductions claimed by petitioners for 1981 and the valuation used for claiming the investment tax credit for that year. To the extent that the underpayment for 1981 is attributable to the disallowed deductions, the section 6659 addition to tax does not apply. . 3. Additional Interest Under Section 6621(c)[10]
*572 In his answer respondent asserted that petitioner is liable for the increased interest imposed by section 6621(c). That section provides for an increase in the interest rate payable under section 6601 with respect to "any substantial underpayment" (i.e., an underpayment exceeding $ 1,000), which is attributable to one or ore "tax motivated transactions." Section 6621(c)(3)(A)(i) defines a tax motivated transaction to include "any valuation overstatement (within the meaning of section 6659(c))." Section 6621(c) is effective as to interest accruing after December 31, 1984, even though the transaction was entered into prior to the enactment of the section. ; ; , affd. without published opinion . The foregoing discussion with respect to the additions to tax under section 6659 shows that the underpayments resulting from the disallowed investment tax credits are attributable to the valuation overstatement with respect to the master recordings. Accordingly, *573 to that extent the section 6621 addition to tax applies. There remains the portion of the underpayment attributable to the disallowed deductions. By the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1535(a), 100 Stat. 2750, effective for interest accruing after December 31, 1984, the term "tax motivated transaction" was defined to mean, among other things, any "sham or fraudulent transaction." [11] H. Rept. 99-841 (Conf.), 1986-3 C.B. (Vol. 4) 796. We think petitioners' purported lease of the master recordings was a sham or fraudulent transaction within the meaning of this section. As detailed in our findings, Audio did not own any rights in the recordings and, therefore, could not have conveyed any leasehold rights to petitioners. Petitioners were concerned only with the pursuit of tax benefits and, even though they represented on their tax returns that the recordings had a value of $ 375,000, petitioners did not have sufficient regard for the bona fides of their representation to take any steps to verify even the existence of the recordings, the lessor's rights in the recordings, or the possibilities of any economic, as distinguished from tax, profit from the venture. *574 Moreover, no factual basis whatever has been shown for the claim of $ 14,000 or the $ 16,000 of lease expense deducted on their 1981 return. We think section 6621(c) requires the imposition of this addition to tax on the ground that the purported lease was a "sham or fraudulent transaction." Cf. . *575 To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, in the form effective in this case unless otherwise noted. ↩
2. The Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c), 100 Stat. 2744, redesignated sec. 6621(d) as sec. 6621(c); the act also altered the definition of "tax motivated transaction" to include "any sham or fraudulent transaction" effective for interest accruing after Dec. 31, 1984. We will hereinafter refer to this section as sec. 6621(c). ↩
3. Petitioners' joint venturer or co-tenant in the G-443 Webb Pierce lease was Robert D. Sparling, who signed his lease on Oct. 28, 1981, and in the G-448 Stonewall Jackson lease, Howard E. Motteler, who signed his lease on the same date. ↩
4. Schedule A, described as stating the consideration for each of these leases, is not attached to leases received in evidence. ↩
5. The Audio statements on the investment credit, as stated above, show a value of $ 200,000 for the Webb Pierce recording and a value of $ 187,500 for the Stonewall Jackson recording, a total value of $ 387,500. The record does not show why a total value of $ 375,000 for the two recordings was used on Form 3468. ↩
6. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard off Rules and Regulations With Respect to Income, Gift, or Windfall Profit Taxes. -- (1) In general. -- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A, by chapter 12 of subtitle B or by chapter 45 (relating to windfall profit tax) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. ↩
7. Sec. 6653(a)(2) provides as follows: (2) Additional amount for portion attributable to negligence, etc. -- There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601 -- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to the negligence or intentional disregard referred to in paragraph (1), and (B) for the period beginning on the last date prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax). ↩
8. SEC. 6659. ADDITION TO TAX IN THE CASE OF VALUATION OVERSTATEMENTS FOR PURPOSES OF THE INCOME TAX. (a) Addition to the Tax. -- If -- (1) an individual, or (2) a closely held corporation or a personal service corporation,
has an underpayment of the tax imposed by chapter 1 for the taxable year which is attributable to a valuation overstatement, then there shall be added to the tax an amount equal to the applicable percentage of the underpayment so attributable. (b) Applicable Percentage Defined. -- For purposes of subsection (a), the applicable percentage shall be determined under the following table: If the valuation claimed is the
following percent of the correct
The applicable
valuation --
percentage is:
150 percent of more but not more than 200 percent
10
More than 200 percent but not more than 250 percent
20
More than 250 percent
30
(c) Valuation Overstatement Defined. -- (1) In general. -- For purposes of this section, there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be). * * * ↩
9. Sec. 6659(e) states as follows: (e) Authority to Waive. -- The Secretary may waive all or any part of the addition to the tax provided by this section on a showing by the taxpayer that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that such claim was made in good faith. ↩
10. SEC. 6621. DETERMINATION OF RATE OF INTEREST. (c) Interest on Substantial Underpayments Attributable to Tax Motivated Transactions. -- (1) In general. -- In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the underpayment rate established under this subsection. (2) Substantial underpayment attributable to tax motivated transactions. -- For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $ 1,000. * * * ↩
11. Sec. 6621(c)(3) defines tax motivated transactions as follows, for interest accruing after Dec. 31, 1984: (c) Interest on Substantial Underpayments Attributable to Tax Motivated Transactions. -- (3) Tax motivated transactions. -- (A) In general. -- For purposes of this subsection, the term "tax motivated transaction" means -- (i) any valuation overstatement (within the meaning of section 6659(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), and (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and (v) any sham or fraudulent transaction. ↩